**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALTON & SOUTHERN RAILWAY COMPANY,** *et al.,* | |
| **Plaintiffs,** | **Lead Case No. 19-cv-03586 (TFH)** |
| **v.** | **Case No. 20-cv-2173 (TFH)** |
| | **Case No. 20-cv-2543 (TFH)** |
| **BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT,** | **Case No. 20-cv-1767 (TFH)** |
| | **Case No. 20-cv-2109 (TFH)** |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

The plaintiffs in this case are a group of twenty-six railroads, including six of the largest rail carriers in the country; the defendant, Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED"), is the union that represents employees of the railroads who are in the "maintenance of way" craft. For purposes of collective bargaining, the railroads are part of a coalition represented by the National Carriers' Conference Committee ("NCCC"). At issue here is whether the Railway Labor Act ("RLA") requires BMWED to bargain on a national basis with the NCCC coalition, or whether it can require certain railroads to bargain on an individual basis with respect to the bargaining round between the parties that began on November 1, 2019. This is familiar territory.

### I. <u>BACKGROUND</u>

The Court decided this issue over twenty-five years ago in *Alton & Southern Railway Co. v. Brotherhood of Maintenance of Way Employes*, 928 F. Supp. 7 (D.D.C. 1996) ("*Alton I*"). Then, applying the test established by the D.C. Circuit in *Brotherhood of Railroad Trainmen v.*

*Atlantic Coast Line Railroad*, 383 F.2d 225 (D.C. Cir. 1967), the Court concluded that the union was obligated under Section 2 First of the RLA to bargain on a national basis with the entire multi-railroad group.  The parties now find themselves in essentially the same dispute.  Still bound to apply *Atlantic Coast Line* as the law of this Circuit, and for the reasons set forth below, the Court holds that BMWED is again required to bargain on a national basis with the railway coalition with respect to all issues in the current wage and rules movement that commenced on November 1, 2019.

Accordingly, on the basis of the relevant legal authorities and the entire record herein, and for the reasons stated below, the Court will grant the Carrier's Motion for Summary Judgment [ECF No. 29] and deny BMWED's Cross-Motion for Summary Judgment [ECF No. 30].

### A.  Bargaining Between the Parties Since *Alton I*

Since the Court decided *Alton I* in 1996, the parties have completed four additional rounds of bargaining, beginning in 1999, 2004, 2009, and 2014.  Carriers' Statement of Undisputed Material Facts ¶ 20 ("Carriers' SOF") [ECF No. 29]; Def.'s Resp. ¶ 20 [ECF No. 30-3].  Each round was a "concerted wages and rules movement" covering issues related to wages, benefits, and work rules.  *Id.*  In all four rounds, BMWED bargained nationally with the railroads represented by the NCCC.  *Id.*

### i.  The 1999 Bargaining Round

The carriers and BMWED both served Section 6 notices covering wages, benefits, and work rules in the 1999 bargaining round.  Carriers' SOF ¶ 26; Def.'s Resp. ¶ 26.  The parties reached a national agreement in 2001 on issues related to wages, benefits, and work rules.  *Id.* ¶ 27; Def.'s Resp. ¶ 27.  The parties also agreed to address certain issues, such as union access to

information about members' employment status, dues, fees, and assessments, at the local level. *Id.* ¶ 28; Def.'s Resp. ¶ 28. The 2001 national agreement also permitted local variations in some aspects of compensation. *Id.* ¶ 29; Def.'s Resp. ¶ 29.

### ii. The 2004 Bargaining Round

In the 2004 round, BMWED and six other rail unions formed their own national coalition known as the Rail Labor Bargaining Coalition ("RLBC"). Carriers' SOF ¶ 30; Def.'s Resp. ¶ 30. The RLBC and the NCCC reached a national agreement in 2007 on issues related to wages and benefits; they failed to reach agreement on any work rule proposals. *Id.* ¶¶ 31-32; Def.'s Resp. ¶¶ 31-32.

### iii. The 2009 Bargaining Round

The RLBC represented BMWED again in the 2009 bargaining round. Carriers' SOF ¶ 33; Def.'s Resp. ¶ 33. In 2011, while the RLBC and the NCCC were still in negotiations, the NCCC reached a national settlement with the United Transportation Union ("UTU") on certain changes in wages and benefits but not on work rules. *Id.* ¶ 35; Def.'s Resp. ¶ 35. The NCCC argued that the UTU settlement set a "pattern," but the RLBC was not willing to accept the same terms. *Id.* ¶ 36; Def.'s Resp. ¶ 36.

Following an unsuccessful mediation attempt, President Obama established Presidential Emergency Board ("PEB") No. 243 to recommend terms for settlement. *Id.*; Def.'s Resp. ¶ 36. The PEB recommended that the RBLC accept the wage and benefits terms accepted by the UTU. *Id.* ¶ 37; Def.'s Resp. ¶ 37. With respect to work rules, the PEB recommended that BMWED's demand for changes to away-from-home expenses be referred to local handling. *Id.* ¶ 38; Def.'s Resp. ¶ 38. In 2012, the parties reached a voluntary agreement based on the PEB's recommendations. *Id.*

### iv.  The 2014 Bargaining Round

In 2014, BMWED formed a coalition with the International Association of Sheet Metal, Air, Rail and Transportation Workers – Mechanical Division ("SMART-Mechanical").  Carriers' SOF ¶ 39; Def.'s Resp. ¶ 39.  The BMWED/SMART-Mechanical coalition and the NCCC bargained nationally over proposed changes to wages and benefits.  *Id.* ¶¶ 40-41; Def.'s Resp. ¶¶ 40-41.  In addition, BMWED proposed various work rules.  *Id.* ¶ 42; Def.'s Resp. ¶ 42.

In 2017, after almost three years of bargaining, the NCCC reached national agreements with all of the rail unions except BMWED/SMART-Mechanical.  *Id.* ¶ 43; Def.'s Resp. ¶ 43.  The agreements included retroactive wage increases, status quo on work rules, and changes in health benefits plans.  *Id.*  The BMWED/SMART-Mechanical Coalition refused to adopt these changes.  *Id.* ¶ 44; Def.'s Resp. ¶ 44.  In 2018, the NCCC and the BMWED/SMART-Mechanical Coalition agreed to submit their dispute to voluntary interest arbitration, with the agreement that any arbitration award would adopt the terms agreed to by the other rail unions with respect to wages and work rules.  *Id.* ¶¶ 44-45; Def.'s Resp. ¶¶ 44-45.  The Arbitration Board ultimately issued an award finding that the health care agreement should also be consistent with the terms adopted by the other rail unions.  *Id.* ¶ 46; Def.'s Resp. ¶ 46.

### B.  The Current Bargaining Round

The moratorium in the parties' 2014 agreement expired on November 1, 2019.  Carriers' SOF ¶ 47; Def.'s Resp. ¶ 47.  The NCCC and BMWED both served Section 6 notices on that date suggesting changes in wages, health and welfare benefits, and work rules.  *See* NCCC Section 6 Notice [ECF No. 29-3 at 18]; BMWED Section 6 Notices [ECF No. 29-3 at 29].  The NCCC's notice stated that the plaintiff railroads intended to bargain with BMWED on a national basis.  *Id.* ¶ 48; Def.'s Resp. ¶ 48.  NCCC also notified BMWED that four railroads – D&H,

METRA, NICTD, and Soo Line – would only join the coalition for health and welfare issues.  *Id.* ¶ 49; Def.'s Resp. ¶ 49.

BMWED chose to bargain again in coalition with SMART-Mechanical.  *Id.* ¶ 55; Def.'s Resp. ¶ 55.  The BMWED/SMART-Mechanical coalition served national Section 6 notices on the majority of the railroads represented by the NCCC but refused to engage in national handling with UP, NSR, Conrail, and the CN Railroads[1] and served "local" Section 6 notices on those railroads.  *Id.* ¶¶ 55, 57; Def.'s Resp. ¶¶ 55, 57.

### C.  Litigation Over the 2019 Bargaining Round

Anticipating the refusal of UP, NSR, Conrail, and the CN Railroads to bargain on a local basis, and in an attempt to avoid the settled law in this Circuit, in late October and early November 2019, BMWED preemptively filed lawsuits against those carriers in district courts in the Sixth and Eighth Circuits.  *See* BMWED Opp'n & Cross Mot. for Summ. J. at 7 ("Because certain Carriers had successfully litigated to bargain on a single carrier basis with BMWED and another rail union in the 8th and 6th Circuits . . ., BMWED filed its complaints in those Circuits.").[2]  In those four cases, BMWED alleged that the railroads' refusal to bargain through local handling violates Sections 2 Third and Fourth of the RLA, as well as Section 2 First, and sought declaratory and injunctive relief requiring each carrier to bargain with BMWED on a single-carrier basis.  The plaintiff railroads then filed this case on November 27, 2019.  Compl. [ECF No. 1].

---

[1]    The CN Railroads are the following U.S. subsidiaries of Canadian National Railroad: Grand Trunk Western Railroad Company; Illinois Central Railroad Company; Wisconsin Central Railroad, Ltd.; and Bessemer & Lake Erie Railroad.  Carriers' SOF ¶ 1; Def.'s Resp. ¶ 1.

[2]    *BMWED v. Union Pac. R.R. Co.*, Case No. 19-cv-00466 (D. Neb.) (filed Oct. 23, 2019); *BMWED v. Consol. Rail Corp.*, Case No. 19-cv-13112 (E.D. Mich.) (filed Oct. 23, 2019); *BMWED v. Norfolk S. Ry. Co.*, Case No. 19-cv-00420 (E.D. Tenn.) (filed Nov. 4, 2019); *BMWED v. Canadian Nat'l Ry.*, Case No. 19-cv-13246 (E.D. Mich.) (filed Oct. 24, 2019).

In each of the cases filed by BMWED, the carriers filed Motions to Dismiss, Transfer, or Stay, arguing that: (1) the actions were barred by principles of issue preclusion; (2) the actions failed to join the other carriers as necessary parties under Federal Rule of Civil Procedure 19(b); and (3) the interests of justice required that the actions be transferred to this Court or stayed pending resolution of this case.  *See, e.g.,* Mem. in Supp. of Def. Union Pacific R.R. Co.'s Mot. to Dismiss, Transfer, or Stay [ECF No. 12], Case No. 19-cv-0466 (D. Neb. Dec. 26, 2019).  All four courts agreed that judicial economy weighed in favor of transferring the cases to this Court "to allow the identical cases to be decided in a single action," and declined to apply the "first-to-file" rule advocated by BMWED.  *See, e.g.,* Mem. & Order Granting Mot. to Transfer [ECF No. 32], Case No. 19-cv-0466 (D. Neb. July 1, 2020).  Following transfer, this Court consolidated all five pending cases on September 21, 2020, establishing this case as the Lead Case.  Order [ECF No. 16].

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  At the summary judgment stage, however, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*  With respect to cross-motions for summary

judgment, "neither party waives the right to a full trial on the merits by filing its own motion;

each side concedes that no material facts are at issue only for the purposes of its own

motion." *Vaughan v. Amtrak,* 892 F. Supp. 2d 84, 91 (D.D.C. 2012) (quoting *Sherwood v.

Washington Post,* 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989)).

      Although "[t]he evidence is to be viewed in the light most favorable to the nonmoving

party and the court must draw all reasonable inferences in favor of the nonmoving party,"

*Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), "[i]f the evidence is merely colorable, or

is not significantly probative, summary judgment may be granted," *Anderson*, 477 U.S. at 249

(internal citations omitted).   "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff." *Id.* at 252.   The ultimate inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Id.*   The non-movant "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).   Accordingly, "[c]onclusory

assertions offered without any factual basis in the record cannot create a genuine dispute

sufficient to survive summary judgment." *Boone v. MountainMade Found.*, 64 F. Supp. 3d 216,

224 (D.D.C. 2014) (citing *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of

Transp.,* 564 F.3d 462, 465–66 (D.C. Cir. 2009)).

      The evidence the Court may consider when ruling on a summary judgment motion

consists of "materials specified in Federal Rule of Civil Procedure 56(c) as well as any material

that would be admissible or usable at trial." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d

118, 145 (D.C. Cir. 2011) (internal quotation marks omitted).   Pursuant to Rule 56(c), the Court

is not limited to the evidence cited by the parties but also "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In addition, the Rules of the United States District Court for the District of Columbia state that "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

### III.   CONTROLLING LEGAL STANDARDS

### a.   The Railway Labor Act

As the Court explained in its opinion granting the carriers' motion for preliminary injunction in *Alton I*,

> [t]he RLA was passed "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions in interstate commerce." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 148 (1969). The RLA does not prohibit strikes, but contains a complex set of procedures for delaying strikes over major disputes, such as the formation or revision of collective bargaining agreements, in order to ensure that the parties have a sufficient opportunity to negotiate and mediate their disputes. *Delaware & Hudson Ry. Co. v. United Transp. Union,* 450 F.2d 603, 607 (D.C. Cir. 1997), *cert. denied,* 403 U.S. 911 (1971). Under these procedures:

>> A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes*, 883 F. Supp. 755, 759 (D.D.C. 1995) (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378 (1969)).

      **b.  The *Atlantic Coast Line* Test**

      In this Circuit, whether national handing is obligatory under the RLA is controlled by an objective two-part test set forth in *Atlantic Coast Line*.  *Atlantic Coast Line*, 383 F.2d at 225. That case involved an attempt by carriers to "abrogate" existing rules regulating the use of conductors and trainmen, or "crew consist," on yard and road crews.  The carriers took the position that a party could demand national movements always be referred to national handling. *Id.* at 228.  The union argued that a party could never be compelled to accept such handling.  *Id.*

      Striking a middle ground, the Circuit ultimately adopted "a more individuated approach" advocated by the United States as *amicus curiae*.  *Id.*  The Circuit held:

> What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past.  The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest.  Such bargaining is certainly lawful, however.  Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements.

*Id.* at 229.  Applying that standard, the court of appeals concluded that the crew consist issue was not appropriate for national handling.  *Id.*  The court found that there had never been a national crew consist rule and that thousands of existing crew consist agreements had been negotiated at the local level.  *Id.*  Particularly significant to the court were findings of a neutral board that had concluded that a national prescription for crew consist was wholly unrealistic.  *Id.* at 229.  The court concluded that while the procedures of the RLA were purposely long and drawn out to

afford a maximum opportunity at resolution, the Act "did not require efforts clearly at war with reality." *Id.*

### c. *Alton I*

*Alton I* arose from the 1994 bargaining round between the parties, which was also a "general wage and rules movement." *Alton I*, 928 F. Supp. at 18. There, just as in the current bargaining round, BMWED rejected the idea of multi-employer negotiations and sought to bargain locally with individual carriers. *Id.* at 11.

The Court ruled in favor of the carriers on cross motions for summary judgment. *Id.* at 19-20. The Court first rejected the union's argument that the *Atlantic Coast Line* test requires a court to engage in a subjective analysis of the reasonableness or good faith of the parties, and explained that the test is "intended to give efficacy to the command of Section 2 First to 'exert every reasonable effort to make and maintain agreements . . . and to settle disputes . . .'" [3] *Id.* at 13. The Court found that the test

> provides a workable method of assessing the parties' respective positions in light of how they have acted in the past as well as whatever changed conditions may exist. What is reasonable (and thus obligatory) under the statute in one circumstance may not be reasonable in another.

*Id.* at 14.

---

[3]     45 U.S.C. § 152 First states:

> **First.  Duty of the carriers and employees to settle disputes.** It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning the rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the applications of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

The Court also rejected the union's argument that requiring it to participate in national bargaining violated its rights under Section 2 Third of the RLA, which guarantees both railroads and employees the right to select their bargaining representative.[4]  *Id.* at 6.  The Court expressed concern that "[t]o prohibit national handling whenever a representation issue existed would be an open invitation for parties to raise the issue.  Such a course of action would effectively overrule *Atlantic Coast Line* – something this Court is unwilling to do."  *Id.* at 15.  Second, the Court said it was "not convinced that the rights of a union under § 2 Third include the right to determine the manner under which negotiations will occur."  *Id.*  The Court held that "Section 2 Third protects a union's right to name the representative of its choice, but it does not entitle that party to dictate other aspects of the bargaining process."  *Id.*

Finding that it was bound to apply *Atlantic Coast Line* as the law of the Circuit, the Court then assessed "(1) whether the parties [had] a long history of negotiating in a particular way; and (2) whether it [was] still appropriate to require the parties to continue to negotiate that way."  *Id.* at 13.  The Court answered both questions in the affirmative with respect to national handling between the parties over wages and benefits, and work rules.

First, the Court reviewed the parties' history of bargaining over wages and benefits and found that:

> [T]he carriers and the BMWE have generally participated in national handling of issues concerning wages and health and welfare benefits.  In fact, it appears that the BMWE and other unions have frequently requested national handling of these issues in the past.

---

[4]     45 U.S.C. § 152 Third states:

> **Third.  Designation of representatives.**  Representatives, for the purposes of this Act, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives....

*Id.* at 16-17.  The Court noted that BMWED and the carriers had negotiated wage adjustments nationally since 1932 and had reached 27 national agreements on wages.  *Id.* at 17.  The parties had likewise negotiated nationally over health and welfare benefits since 1954 and had reached 20 national agreements on that subject.  *Id.*

The Court also found that the practicality of handling wage disputes nationally was "readily apparent":

> Obviously if wage adjustments were to be handled on an individual carrier basis, each carrier would be deterred from settling because the possibility that a competing carrier might obtain better terms; and, by the same token, union members would be dissatisfied if employees on other railroads doing the same job received higher salaries.

*Id.* (quoting *Int'l Ass'n of Machinists v. NRLC*, 310 F. Supp. at 912).

Similarly, the Court found that national handling of health and welfare issues was practically appropriate because "structural changes in plan benefits can be implemented only by the national policyholders of the plans."  *Id.*  Moreover, the Court noted, "[e]ven if the structural problems could be dealt with, the give-and-take required of legitimate local negotiations over health and welfare as well as other issues would be incompatible with the survival of national plans."  *Id.* (quoting *Int'l Ass'n of Machinists and Aerospace Workers v. Nat'l Ry. Labor Conf.*, 310 F. Supp. 905, 912 (D.D.C. 1970)).

With respect to work rules, the Court held that "the rules cannot be assessed in isolation but only as they were actually presented in this case, in the carriers' and BMWE's § 6 notices alongside the wage and benefit issues."  *Id.*  The Court found that the rule proposals were "sufficiently germane to require handling at the same time as the wages and health and welfare issue."  *Id.* at 18; *see Delaware & Hudson Ry. v. United Transp. Union*, 450 F.2d 603, 609-10, n.

14 (D.C. Cir. 1971).  Based on these findings, the Court ordered the union to bargain on a

national basis with the NCCC on all issues.  *Id.* at 20-21.

   **d.  *BNSF Railway v. UTU***

   Several years after this Court's decision in *Alton I*, three local committees of the United

Transportation Union ("UTU"), which represented conductors, trainmen, firemen, and

yardmasters, sued Burlington Northern and Santa Fe Railway Company ("BNSF") and the

NCCC, arguing that BNSF could not require them to bargain nationally with the NCCC during

the 1999 wage and rules movement.  *BNSF Ry. Co. v. United Transp. Union*, 141 F. Supp. 2d 49,

51 (D.D.C. 2001) (Sullivan, J.).  The district court granted summary judgment to the union

committees, holding that *Atlantic Coast Line* did not apply because the union was not acting in

"subjective bad faith."  *Id.* at 58.

   The court of appeals reversed the ruling on appeal, holding that *Atlantic Coast Line* is the

controlling test when assessing "when and under what circumstances may a carrier or union

under the RLA compel an opposing party to bargain on a national or local level."  *BNSF Ry.*, 295

F.3d at 1339.  Accordingly, the Circuit explained that a district court must conduct "an issue-by-

issue evaluation of the practical appropriateness of mass bargaining on that point and of the

historical experience in handling any similar national movements."  *Id.* at 1340 (quoting *Atlantic

Coast Line*, 383 F.2d at 229).  The Circuit also rejected a "subjective bad faith" analysis and

reiterated that the district court "should make an objective assessment of the parties' past

bargaining practices," as applied by this Court in *Alton I.  Id*.

   On remand, the case was reassigned to Judge Walton, who applied the *Atlantic Coast

Line* test and held that the carriers could require the union committees to participate in national

handling.  *BNSF Ry.*, 290 F. Supp. 2d at 151.  *Atlantic Coast Line* remains the law of the Circuit.

## IV.   <u>DISCUSSION</u>

### a.   The Court is Bound to Apply *Atlantic Coast Line*

The railroads argue that national handling in the current wages and rules movement is

obligatory under the RLA pursuant to the test set forth in *Atlantic Coast Line*, as the Court

previously held in *Alton I*.  BMWED

> recognizes that the Court in *Alton & Southern* concluded that it was bound by
> *Atlantic Coast Line* as Circuit precedent.  If the Court still feels so bound, BMWED
> respectfully urges the Court to consider developments since *Alton & Southern* and
> the conflicted position of the Carriers, and recommend that *Atlantic Coast Line* be
> overruled or at least not applied in this case.

BMWED Opp'n & Cross Mot. for Summary J. at 3 [ECF No. 30-1].  While the union's concerns

do not fall on deaf ears, the Court is, of course, still bound to apply the law of the Circuit, and is

again unwilling to effectively overrule *Atlantic Coast Line*.

### i.   Representation Rights Under the RLA

As in *Alton I*, BMWED again argues that it has a right under the RLA to bargain locally

with single carriers, and that requiring it to participate in national handling violates its rights

under Section 2 Third to designate a bargaining representative.[5]  BMWED Opp'n and Cross

Mot. at 14 [ECF No. 30-1].  But the Court squarely rejected this argument in *Alton I*.  The Court

expressed concern that "[t]o prohibit national handling whenever a representation issue existed

would be an open invitation for parties to raise the issue.  Such a course of action would

effectively overrule *Atlantic Coast Line* – something this Court is unwilling to do."  *Alton I*, 928

F. Supp. at 15.  Second, the Court said it was "not convinced that the rights of a union under § 2

---

[5]      The carriers also argue that collateral estoppel bars BMWED from rearguing this issue
based on the Court's prior ruling in *Alton I*.  Carrier's Mem. of P. & A. at 22 [ECF No. 29].
Because the Court is deciding the issue on its merits, it is not necessary for the Court to decide
whether collateral estoppel applies.

Third include the right to determine the manner under which negotiations will occur." *Id.* The Court held that "Section 2 Third protects a union's right to name the representative of its choice, but it does not entitle that party to dictate other aspects of the bargaining process." *Id.*

BMWED again relies on cases from the Sixth and Eighth Circuits, which held that a railroad cannot be forced to join a multi-carrier bargaining coalition. *See ARASA v. Soo Line R.R.*, 891 F.2d 675 (8th Cir. 1989); *UTU v. Grand Trunk Western R.R.*, 901 F.2d 489 (6th Cir. 1990). But these cases were decided prior to the Court's decision in *Alton I*, and *Soo Line* was expressly distinguished by the Court:

> The Court does not believe that the *Soo Line* decision compels a different result. The BMWE argues that the decision in *Soo Line* properly illustrates the relationship between § 2 First and § 2 Third. There is, however, a significant difference between what *Soo Line* means and what BMWE asks this Court to find. The court in *Soo Line* did not find, as the BMWE suggests, that a party's rights under § 2 Third trump the § 2 First obligation to engage in national handling. As previously discussed, the Eighth Circuit found that the only obligation under § 2 First was to negotiate in good faith. 891 F.2d at 677. The court clearly disagreed with the significance of the holding of *Atlantic Coast Line,* going so far as to state that it was "aware of no decision that construes this duty to obligate [a party] to bargain for a national contract through a national bargaining representative." *Id.* at 677–78. Revealing is the suggestion by that court that the two-part test in *Atlantic Coast Line* was "dicta," notwithstanding that three previous courts in this jurisdiction had applied it, and the Court of Appeals that had affirmed its application. Regardless of the future viability of *Atlantic Coast Line,* it does exist today and unlike the Eighth Circuit this Court does not have the luxury of opting to ignore its holding. The failure of the court in *Soo Line* to find any rights beyond bargaining in good faith suggests that had it been a pure § 2 First case the court would have reached exactly the same result. Accordingly, that case offers little guidance in how to square this circuit's assessment as to when national handling is obligatory with the injection of a § 2 Third issue.

*Alton I*, 928 F. Supp. at 15-16. BMWED acknowledges as much. *See* BMWED's Opp'n and Cross Mot. at 19 ("this Court's prior decision in *Alton & Southern* . . . concluded that, regardless of subsequent decisions of the Eighth and Sixth Circuits, this Court was bound by D.C. Circuit precedent.").

In *Alton I,* the Court remarked that

> [t]he Eighth Circuit was apparently concerned about the possibility that once national handling began it could be maintained perpetually.  *See Soo Line,* 891 F.2d at 678 (to conclude other than that each proposal under section 6 initiates a new distinct set of negotiations "would, in effect, perpetually bind a [party] to national representation once it agrees to such representation for a particular bargaining round.").  While this Court shares that concern, as discussed at other points in this opinion, the Court does not agree that *Atlantic Coast Line* compels such a result.

*Alton I,* 928 F. Supp. at 15 n.15.  The union argues this is just what has happened: "[T]he *Atlantic Coast Line* test has devolved into a rule that national handling is always required, if a carrier desires national handling, but never required if the carrier prefers single carrier bargaining."  *Id.* at 24.  According to BMWED,

> [t]he history of bargaining element simply means that once a union engages in national handling, it cannot extricate itself from national handling in the future if the carrier or carriers insist on national handling.  And the appropriateness of the issue for national handling element has lost its substance since a carrier can simply convert any issue into a national bargaining issue by participating in a national Section 6 Notice concerning wages and arguing that everything is germane to legal costs, so everything has to be bargained nationally.

*Id.* at 24-25.

But as earlier discussed, the Circuit decided *BNSF Railway* subsequent to *Alton I* and held that Section 2 Third is not relevant to the analysis of whether national handling is obligatory under *Atlantic Coast Line*.  *BNSF Ry.*, 295 F.3d at 1340.  BMWED cannot succeed on this issue under the current law of the Circuit.[6]  The Court again holds that requiring BMWED to participate in national handling does not violate the union's rights under the RLA.

---

[6]      BMWED also invokes Section 2 Fourth, which provides in part, "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing.  The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class . . . ," and Section 2 Ninth, which relates to disputes as to identity of representatives.  *See* BMWED Opp'n and Cross Mot. at 14, 17.  BMWED offers scant explanation as to how these sections afford it an absolute right to refuse national handling, but

### b.   Application of *Atlantic Coast Line* to the Current Bargaining Round

As it focuses the majority of its argument attempting to convince the Court that the

*Atlantic Coast Line* test is no longer a workable standard for determining when national handling

is required, BMWED does not spend much time addressing the application of that standard to the

specific facts at issue in the current round of bargaining.  Not surprisingly, the carriers argue that

> [t]he parties' "historical experience" and the "practical appropriateness" of bargaining continue to support national handling with respect to all of the issues in the current "general wage and rules movement," including wages, benefits, and work rules.

Carriers' Mot. for Summ. J. at 24.  The Court agrees.

### i.   Wages, and Health and Welfare

The historical practice of the parties continues to support handling wage and health and

welfare movements nationally.  As the carriers explain,

> [i]n the 25 years since *Alton I*, BMWED has continued to bargain wages at the national level.  Statement ¶ 20.  It has done so through all of the five most recent rounds of bargaining (including the 1994 round).  *Id.*  In every one of those bargaining rounds, the parties were successful in reaching voluntary agreements on wages that apply to all BMWED represented employees, nationwide, without any strikes, lock-outs, or other disruptions to commerce. *Id.* ¶ 21.  One of those rounds required a PEB, but even that round settled without any use of self-help by either side. *Id.* ¶¶ 36-38.

*Id.*  As for practical experience, the carriers argue that "it remains true that 'the practicality of

handling wage disputes on a national basis is readily apparent.'"  *Id.* (quoting *Alton I*, 928 F.

Supp. at 17).

In addition, there continues to be a long history of national bargaining over

health and welfare issues:

> Just as with wages, this historical record of national handling has continued unabated through the last five rounds of bargaining between the railroads and

---

just as the Court found in *Alton I* that Section 2 Third did not provide the right to define the bargaining form, neither do Sections 2 Fourth or Ninth. *See Alton I,* 928 F. Supp. at 16.

> BMWED.  From 1996 through 2018, BMWED – voluntarily and without objection – bargained with the NCCC coalition on a wide range of benefits issues, reaching a total of five national agreements that covered matters such as eligibility for coverage, supplemental sickness benefits, off-track vehicle accident benefits, dental benefits, vision care, employee contributions, prescription drugs, telemedicine, flexible spending accounts, co-pays and co-insurance, deductibles, and a wide range of similar issues.

Carriers' Mot. for Summ. J. at 26.

### ii.  Work Rules

As the Court stated in *Alton I*, if the work rules are "sufficiently germane" to wages to "require handling at the same time as the wages and health and welfare issue," the Court does not have to engage in "a detailed analysis of the history of each particular rule."  *Alton I*, 928 F. Supp. at 18; *see also Delaware & Hudson*, 450 F.2d at 609-10 n.14; *Nat'l Ry. Labor Conference*, 310 F. Supp. at 912 (same).  The carriers assert that the work rules are germane to wages in the current round of bargaining because work rules have a clear relationship to employee compensation; and that BMWED's own Section 6 notices effectively concede that its work rule proposals are germane to wages and benefits as the notices include proposals related to work rules, wages, and benefits.  Carriers' Mot. for Summ. J. at 30.

BMWED states that it seeks to bargain locally with NSR, UP, Conrail, and the CN Railroads because of work rules issues specific to those individual carriers, and that proposals for rule changes in particular agreements are not addressed in national coalition Section 6 bargaining.  But in *Alton I,* the Court found that "[i]n the past, rules proposals have been handled together with wage proposals in national multi-employer bargaining," *Alton I*, 928 F. Supp. at 18, and that practice has continued, *see* Carriers' Mot. for Summ. J. at 31.  Here, as in *Alton I*, the work rules proposals at issue are sufficiently germane to require handling at the same time as the wages and health and welfare issues.

### c.   BMWED's Counterclaim

On December 23, 2020, BMWED filed a counterclaim against two of the plaintiff carriers, alleging it is a violation of Section 2 First of the RLA for Soo Line and D&H  -- two U.S. subsidiaries of Canadian Pacific – to join the national coalition for health and benefits but not for wages and work rules, and seeking an order prohibiting such partial participation. BMWED Answer and Countercl. at 8-9 [ECF No. 27].  BMWED argues that if it "can be compelled to participate in national handling, Soo Line and D&H cannot refuse to participate in national handling with respect to wages and rules."  BMWED Opp'n and Cross Mot. at 42.  The carriers argue that the counterclaim should be dismissed because (1) it is barred by the statute of limitations, and (2) even if timely, the claim fails as a matter of law.  Carriers' Mot. for Summ. J. at 35-36.

The carriers argue that BMWED's counterclaim should be dismissed because both prongs of the *Atlantic Coast Line* test support the conclusion that Soo Line and D&H may bargain at the national level about health and welfare issues.  Carriers' Mot. for Summ. J. at 36. They allege that "there is a long history of certain small railroads who participate in the National Plan electing to join national handling only on health and welfare," a practice to which BMWED has never objected, and that it is "practically appropriate" for such partial participation by parties subject to the National Plan because of the reasons explained by the Court in *Alton I. Id.*  For its part, BMWED admits that it has never objected to this practice.  Carriers' SOF ¶ 52; Def.'s Resp. ¶ 52.

The union argues, however, that refusal to engage in national handling on wages and rules is a violation of Section 2 First under *Atlantic Coast Line*: "[U]nder the *Atlantic Coast Line* test, the germaneness of the issue to national bargaining can require national bargaining.  So, if

national handling can be compelled, then Soo and D&H cannot participate in national handling only for health and welfare benefits, but not for wages and rules."  BMWED Opp'n and Cross Mot. at 44.  This, BMWED claims, "is the sort of outcome that was deemed problematic in *Alton & Southern* - that negotiations over wages would be separated from negotiations over other important issues, and that negotiating some issues nationally while others are negotiated locally '"would be inconsistent with the give-and-take vital to resolution of disputes."'  *Id.* at 23 (quoting *Alton I*, 928 F. Supp at 18-19).  The carriers counter that "again, the union is mixing disparate concepts" and that each railroad has a right to decide whether and to what extent to be represented by the NCCC.  Carriers' Opp'n and Reply at 10.  Therefore, the carriers argue, "it is not inconsistent to say that BMWED must bargain with the NCCC but that individual railroads are not obligated to surrender their autonomy for issues other than health and welfare."  *Id.*

The carriers have the better argument.  Soo Line and D&H have the right under Section 2 Third to choose their own representative, and they have chosen to be represented by NCCC for only health and welfare benefits.  Nothing in the RLA or *Atlantic Coast Line* prohibits these carriers' "partial participation" in national bargaining.  What Section 2 First requires, of course, is that the parties "exert every reasonable effort to make and maintain agreements . . . and to settle all disputes. . . ."  As the Court has stated, the *Atlantic Coast Line* test is intended to give efficacy to that command and allows courts to determine whether a demand to bargain in a certain manner is in fact reasonable.  *Alton I*, 928 F. Supp. at 13.  Here, there is ample evidence in the record establishing that it has been the historical practice of these parties to join national handling only for health and welfare benefits because they participate in the Railroad Employees National Health and Welfare Plan, which covers BMWED's employees.  Branon Decl. ¶ 16 [ECF No. 29-3].  It is also practical and appropriate for Soo Line and D&H to handle health and

welfare matters nationally because, as explained in *Alton I*, "structural changes in plan benefits can be implemented only by the national policyholders of the plans," and "[e]ven if the structural problems could be dealt with, the give-and-take required of legitimate local negotiations over health and welfare as well as other issues would be incompatible with the survival of national plans." *Alton I*, 928 F. Supp. at 17 (quoting *Int'l Ass'n of Machinists and Aerospace Workers v. Nat'l Ry. Labor Conf.,* 310 F. Supp. 905, 912 (D.D.C. 1970)). Accordingly, the Court finds that partial participation in national handling does not violate the RLA, and BMWED's counterclaim against Soo Line and D&H shall be dismissed.[7]

## V.   CONCLUSION

The Court certainly echoes its sentiments from *Alton I* regarding the effect national bargaining may have on the union's leverage, but again, the heart of BMWED's concerns cannot be fixed by this Court. *See Alton I*, 928 F. Supp. at 20. Congress has not revisited the RLA, and the Court is still bound to apply *Atlantic Coast Line* as the law of the Circuit.

The Court has considered the remaining arguments offered by the parties and finds them to be superfluous or without merit in light of the Court's reasoning above. Therefore, and for the reasons above, the Court will grant the Carrier's Motion for Summary Judgment [ECF No. 29] and deny BMWED's Cross-Motion for Summary Judgment [ECF No. 30]. An appropriate Order accompanies this Opinion.

March 30, 2022

_____
Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE

_____

[7] Because the Court dismisses BMWED's counterclaim on the merits, it does not reach the carriers' statute of limitations arguments.